# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN SATH O/B/O M.S, | CASE NO. 3:13-cv-02459-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 8, 9, 15, 16 |

## I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff M.S., a child under the age of eighteen, for supplemental security income ("SSI"). Plaintiff was five years old on the date of the application and six years old on the date of the decision. Plaintiff's mother, Karen Sath, filed for benefits on his behalf, and initially claimed that he was disabled as a result of seizures, asthma, and a heart condition. However, Ms. Sath reported on multiple occasions that Plaintiff's seizures had stopped entirely once he was prescribed the proper dose of his seizure medication. The medical evidence shows that, throughout the relevant period, Plaintiff's asthma and heart condition were stable and well-controlled and he was released to full aerobic activity without restriction. After Plaintiff's claim was initially denied, Plaintiff obtained counsel, sought review of the decision, and for the first time, asserted that Plaintiff's mental impairments caused limitations that functionally equaled the listings.

In this appeal, Plaintiff asserts only that he has a marked or extreme limitation in acquiring and using information, moving about and manipulating objects, and caring for himself. However, prior to obtaining counsel, Ms. Sath repeatedly represented that he had no problem acquiring and using information and that he had no mental limitations. Plaintiff is in grade-level, regular classes, does not need a special education curriculum, and tested in the "average" range in academic achievement and functioning. Although Ms. Sath now claims that Plaintiff cannot dress himself, tie his shoes, or use scissors, she previously reported that he uses scissors well and that he had "no" problem caring for himself. She reported to Plaintiff's primary care physician during his well-child visits that he could dress himself and tie his shoes. She testified that he could play Wii, climb ladders at the playground, and fully participate in T-ball, sometimes even hitting the ball without needing the tee. Although she claimed that Plaintiff engages in self-injurious behaviors, she reported to counselors in 2009 that such behaviors had entirely stopped, and her claims in this regard were contradicted by Plaintiff's teachers' reports.

Plaintiff claims that the ALJ's decision lacked substantial evidence in the three disputed domains because the ALJ allegedly did not explain the weight he gave to the assessment by Plaintiff's first grade teacher, Mrs. Guiser, or explain whether he found Ms. Sath's claims to be credible. However, the ALJ discussed Mrs. Guiser's opinion and Ms. Sath's testimony in the context of his functional equivalence analysis, identifying aspects of each that was internally inconsistent and inconsistent with other evidence. Plaintiff also claims that the ALJ's decision lacks substantial evidence in the three disputed domains because he improperly assigned great weight to the state agency psychologist and did not obtain an updated opinion after additional evidence was submitted. However, an ALJ only needs to obtain an updated medical opinion

when the opinion addresses medical equivalence and new medical evidence would change the doctor's opinion. Here, functional equivalence, not medical equivalence, is the issue. Moreover, the only additional medical evidence suggested that Plaintiff's limitations were less than marked. Other evidence was also submitted after the state agency psychologist report, including an IEP and Mrs. Guiser's assessment. However, this is not additional <u>medical</u> evidence. Additionally, as discussed below, these records support the state agency psychologist's conclusion. The Court finds no updated medical opinion was needed. Moreover, the ALJ had substantial evidence to support his determination in each domain, even without the medical opinion, so any error was harmless. For all of the forgoing reasons, the Court denies Plaintiff's appeal.

## II.      Procedural Background

Plaintiff previously applied for benefits and was denied on June 25, 2010. (Tr. 81)[1]. On December 27, 2010, Plaintiff filed an application for SSI under Title XVI of the Social Security Act. (Tr.12). On April 4, 2011, the Bureau of Disability Determination[2] denied this application (Tr. 80-92), and Plaintiff filed a request for a hearing.  (Tr. 98-100). On February 1, 2012, an ALJ held a hearing at which Plaintiff, who was represented by an attorney, and Ms. Sath, appeared and testified (Tr. 30-79).   On March 23, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 12-29). On May 5, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-8) which the Appeals Council denied on August 1, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

---

[1] References to "Tr." are to pages of the administrative record filed by the Defendant as part of her Answer on November 26, 2013.

[2] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On September 25, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 26, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On February 21, 2014, Plaintiff filed a brief in support of his appeal. ("Pl. Brief") (Doc. 15). On March 27, 2014, Defendant filed a brief in response. ("Def. Brief") (Doc. 16). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned Magistrate Judge on June 17, 2014, and an order referring the case to the undersigned Magistrate Judge for adjudication was entered on June 18, 2014. (Doc. 18, 19).

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

## IV.     Sequential Evaluation Process

For a child under age 18 to be entitled to SSI benefits, he must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(c)(I). Evaluating childhood disability follows a three-step sequential process, under which the Acting Commissioner will consider: (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. 20 C.F.R. § 416.924.

A child functionally equals a listing when his impairment is of listing level severity, i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The six domains of functioning used in determining functional equivalence are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A marked limitation in a domain is found when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities, or where the child is testing at two to three standard deviations below average. 20 C.F.R. § 416.926a(e)(2). An extreme limitation in a domain is found when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities, or where the child is three standard deviations or more below average. 20 C.F.R. § 416.926a(e)(2).

## V. Relevant Facts in the Record

Plaintiff was born on September 1, 2005, and the regulations classified him as a preschool child at the time of his application and a school-age child on the date of the ALJ's decision. 20 C.F.R. §§ 416.926a(g)(2)(iii)-(iv). (Tr. 36). Plaintiff alleged disability as a result of seizures, but the record indicates that seizures occurred only between March 25, 2010 and May 2, 2010, when Plaintiff was prescribed a proper dose of seizure medication.[3] Plaintiff also asserts that his heart condition and asthma limited him from running and moving about, but he was released after each visit with his cardiologist to full aerobic activity. His heart condition and asthma were well-controlled on medication throughout the relevant period. Plaintiff was seen by mental health professionals beginning in May of 2009, and was diagnosed with Disruptive Behavior Disorder, but he made progress on each of his goals, and, after a positive prognosis on entering kindergarten, did not receive any additional mental health treatment. Ms. Sath claims that he has ADHD, but the record indicates no diagnosis of ADHD, and, although Plaintiff was referred for an evaluation of his ADHD on October 13, 2011, the record does not contain evidence of an evaluation or any subsequent mental health treatment. Plaintiff was never treated with medication for his mental impairments.

On December 28, 2009, Plaintiff was evaluated by Enhanced Mental Health Services. (Tr. 442). Plaintiff was four years old. (Tr. 442). He was diagnosed with Disruptive Behavior or Disorder. (Tr. 442). Plaintiff was "generally" alert, oriented, and speaking intelligibly. (Tr. 442). Notes indicate that Plaintiff "enjoys playing blocks, playing at the park, listening to stories that are read to him and watching TV." (Tr. 442). Plaintiff "demonstrates adequate gross motor skills.

---

[3] Although Ms. Sath reported that Plaintiff had seizures on October 25, 2010 and February 8, 2011, when he was already on his way to the doctors' for a cough, he demonstrated no symptoms of seizures and Ms. Sath later reported in June of 2011 that Plaintiff had not suffered seizures for over a year, since starting Tegretol in May of 2010.

His gait appears normal." (Tr. 442). Plaintiff's "needs" included his level of compliance with authority figures and established rules, development of coping and self-regulation skills to better control his anger and frustration, and development of positive social interactions when he is not the winner of a game or activities. (Tr. 443). Plaintiff had "demonstrated progress in the school/Head Start setting and at home in the areas of following established classroom rules, following verbal directions, increase in interactive play and use of social communication skills. Data reflects that he has mastered [some] Short Term Goals." (Tr. 443). Ms. Sath reported that "[t]antrum behaviors identified as hitting his head with his fists, stomping feet, throwing objects and screaming have decreased to zero in the home, school, and community setting." (Tr. 444).

On March 25, 2010, Plaintiff was seen at the Family Practice Center with his mother, who reported he had four seizures that day. (Tr. 339). Plaintiff appeared acutely ill, weak, mildly dehydrated, and flushed. (Tr. 339). On March 28, 2010, Plaintiff was admitted to the hospital with seizures. (Tr. 364-65). He had a normal MRI of the brain. (Tr. 356). Plaintiff was prescribed diazepam to treat his seizures and discharged home in stable condition the next day. (Tr. 358, 368).

Plaintiff saw Dr. William H. Trescher, M.D., for an evaluation of his seizures on April 20, 2010. (Tr. 382). He reported continued seizures since his discharge from the hospital in March. (Tr. 382). Plaintiff had "been otherwise active and without any change in his overall cognitive status." (Tr. 382). Plaintiff was alert, spoke in full sentences, and was appropriately interactive. (Tr. 382). Plaintiff's "[m]otor examination revealed normal muscle tone, bulk and full strength in the arms and legs. Finger-nose movements were intact without ataxia or tremor. Hand tapping and pronation and supination were symmetrical…His gait was steady and narrow

based." (Tr. 382). Plaintiff had a normal EEG, and Dr. Trescher noted that, "[w]ith a normal EEG in the past, I am inclined to think these could be either partial or secondary generalized episodes." (Tr. 382). Dr. Trescher started Plaintiff on carbamezine (Tegretol) to treat the seizures. (Tr. 382).

On April 26, 2010, Plaintiff followed-up for his heart condition at Pediatric Cardiology Clinic. (Tr. 370). Plaintiff's physical exam, electrocardiogram, and echocardiogram were "consistent with a largely stable cardiovascular course." (Tr. 371). His cardiologist noted that Plaintiff "should continue to refrain from sustained isometric activities. He may participate in all forms of aerobic activity. (Tr. 371).

Plaintiff was seen in the emergency room on May 2, 2010, after suffering three seizures at home and one seizure in the waiting room. (Tr. 314-325, 384). Plaintiff's seizure medication was increased and, after close monitoring, was discharged the same day in stable condition. (Tr. 316, 385).

On July 12, 2010, Plaintiff saw Dr. Trescher for a follow-up of his seizures. (Tr. 313). Plaintiff had not suffered any seizures since starting on the Tegretol. (Tr. 311). Plaintiff was "alert, active and spoke in full sentences. He was able to follow simple commands." (Tr. 312). Plaintiff's motor examination was normal, with normal muscle tone, bulk, and full strength. (Tr. 312). Plaintiff "was able to reach for objects without any ataxia or tremor." (Tr. 312). Plaintiff's gait was steady, and he was "able to bounce the ball around the room without any difficulty." (Tr. 312). Ms. Sath reported that he was sleepy, but admitted that he does not go to sleep until 11 p.m. (Tr. 311). Dr. Erdman noted that "[b]efore completely attributing his sleepiness to

carbamazepine, I would strongly recommend better sleep hygiene. I discussed this with the mother about getting him to sleep earlier." (Tr. 312).

On August 23, 2010, Plaintiff was evaluated at Swisher Behavioral Health Services. (Tr. 294-298). Plaintiff was entering kindergarten. (Tr. 294).  Plaintiff was diagnosed with Disruptive Behavior Disorder.  (Tr. 442).  Ms. Sath reported that Plaintiff is has a "good memory and a big heart." (Tr. 294). She also reported that he had made "a good deal of progress."  (Tr. 294). She reported that he was "improving in his ability to express himself without becoming upset and frustrated." (Tr. 294). Ms. Sath reported that Plaintiff did not have an IEP and was not expected to need one. (Tr. 295). Ms. Sath reported that Plaintiff "gets along with the family." (Tr. 295). During the interview, Plaintiff was alert and appeared to be oriented, although he refused to answer questions about orientation. (Tr. 296). Plaintiff's speech was limited but intelligible. (Tr. 296). "No gross motor deficits were noted and gait was observed to be normal." (Tr. 296).  He was distractible and in a "silly" mood but was cheerful throughout and appeared to put forth good effort. (Tr. 296). The doctors opined that Plaintiff had "largely adjusted to his medical situation which is reported to be stable" but "warrants the continuation of BHRS invention" through his transition to kindergarten. (Tr. 296). The notes explained that, "[h]owever, assuming that [Plaintiff] successfully transitions to the kindergarten environment, services should be titrated and then discontinued after three months. Prognosis is positive." (Tr. 296). There is no evidence of subsequent mental health treatment.

On September 13, 2010, Plaintiff was seen at the Family Practice Center for his five year old well-child visit. (Tr. 341). Ms. Sath had "no specific concerns." (Tr. 341). Plaintiff had a benign physical exam. (Tr. 343). Plaintiff met his developmental markers, as he was able to print

his name, use "I" correctly, sit and play or watch a movie for more than twenty minutes, draw a person with at least five body parts, skip, jump on one foot, make his own decisions, and dress himself without help. (Tr. 341). Plaintiff's sleep was described as average, and his behavior was described as "generally happy and content." (Tr. 341). Plaintiff was able to count to ten, say his alphabet, knew nursery rhymes, recognized five colors, recognized letters, spoke understandably and demonstrated make believe "magical thinking." (Tr. 342). His affect was normal and his speech was "clear and fluent." (Tr. 343). Plaintiff walked normally and had full range of motion in his upper and lower extremities bilaterally. (Tr. 343).

On October 25, 2010, Plaintiff was seen at the Family Practice because he had scratched his eye at school. (Tr. 347). Ms. Sath asserted that he had a seizure on the way to the appointment, but was not having any complications at the time of his exam. (Tr. 347). She reported that Plaintiff's last seizure had occurred five months earlier. (Tr. 347).

Ms. Sath applied for benefits for Plaintiff on December 27, 2010. On December 28, 2010, Ms. Sath completed a Function Report. (Tr. 155-164). She reported that Plaintiff has no problem seeing, hearing, communicating, understanding and using what he has learned, behavior, ability to care for his personal needs, ability to pay attention and stick with a task. (Tr. 158-163). The only limitations she identified were limitations in Plaintiff's physical abilities. (Tr. 166).

On February 3, 2011, Plaintiff saw Dr. Michele M. Carr, DDS, M.D, Ph.D for tonsil and breathing problems. (Tr. 417). Ms. Sath reported that his tonsils were enlarged and that he snores, struggles to breathe at night, and wakes up during the night. (Tr. 416). Ms. Sath reported that she "doesn't feel he is hyperactive or irritable during the day." (Tr. 416).  Dr. Carr concluded that Plaintiff had obstructive sleep apnea and adenotonsillar hypertrophy and

recommended surgery. (Tr. 417). On March 25, 2011, Dr. Carr performed the surgery with no complications. (Tr. 272-73).

On February 8, 2011, Plaintiff presented to the Emergency Room at Hershey Medical Center with cough, seizure and febrile seizure. (Tr. 304).  Ms. Sath asserted that the seizure occurred just prior to arrival and was witnessed by family members. (Tr. 304). Plaintiff's seizure symptoms were allegedly generalized, with no bowel or bladder incontinence and no postictal symptoms. (Tr. 304). Plaintiff was discharged in improved condition. (Tr. 306).

In a disability report from February 18, 2011, Ms. Sath indicated that Plaintiff's only disabling illnesses and injuries were his heart problem and seizures. (Tr. 166). She reported that Plaintiff had not been tested for behavioral or learning problems, was not in special education, and was not in speech or language therapy. (Tr 169).

On March 1, 2011, Suzanne Lutinski, Plaintiff's first grade teacher, completed a teacher assessment. She reported that Plaintiff was at grade level in all subjects and needed no special education services. (Tr. 185). She reported that there was no unusual degree of absenteeism. (Tr. 185). She did not indicate that any activity was a "serious" or "very serious" problem. (Tr. 186). She indicated slight problems with attending and completing tasks and  interacting and relating with others. (Tr. 187-88).   With regard to health and physical well-being, she noted that Plaintiff's "mother has reported seizure and heart issues but we have not seen them here at school." (Tr. 191).

Overall, she indicated a slight problem with acquiring and using information. (Tr. 189). She reported "no problem" with understanding oral instructions, reading and comprehending written material, and comprehending and doing math problems. (Tr. 186). She indicated a slight

problem with understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem solving skills in class discussions. (Tr. 186). She noted an obvious problem with expressing ideas in written form. (Tr. 186). She did not indicate that any activity was a "serious" or "very serious" problem. (Tr. 186). She explained that "[Plaintiff] is reluctant to do ANYTHING independently. He has age appropriate skills but seldom attempts them without minimal to extreme complaint… He is capable of doing the work but does not want to attempt it on his own. We are able to get most things accomplished with verbal reinforcement but recess time is often used to complete work. This gets the job done quicker." (Tr. 186).

Overall, she reported a slight problem with moving about and manipulating objects. (Tr. 189). She reported "no problem" with showing a sense of body's location and movement in space, integrating sensory input with motor output, and planning, remembering, and executing controlled motor movements. (Tr. 189). She reported a "slight problem" with moving the body from one place to another and managing pace of physical activities or tasks. (Tr. 189). She reported obvious problems with moving and manipulating things and demonstrating strength, coordination, and dexterity. (Tr. 189). She did not indicate that any activity was a "serious" or "very serious" problem. (Tr. 186). She explained that "[Plaintiff] has a hard time with fine motor skills, especially writing. He is unable to get his handwriting to fill a space accurately. He often colors outside the lines, but no longer just scribbles on a page. Large motor skills are much better. Cutting also gives him difficulty sometimes although he is more willing to attempt it then he was before." (Tr. 189).

Overall, she reported an obvious problem with caring for himself. (Tr. 190). She noted no problem with taking care of personal hygiene, and slight problems with being patient, caring for his physical needs, and using good judgment regarding personal safety and dangerous circumstances. (Tr. 190). She reported obvious problems with handling frustration appropriately, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, using appropriate coping skills to meet daily demands of the school environment, and knowing when to ask for help. (Tr. 190). She explained that "[Plaintiff] acts out with crying, yelling, and disruptive noises when things do not go his way. He asks for help constantly but not to calm down, to get the adult to do whatever he does not want to do for him. He does not manage those anger feelings well at all and gets very frustrated often." (Tr. 190).

On April 21, 2011, Plaintiff was seen by Sharilee Hrabovsky, RN, MSN, CRNP. (Tr. 422-24) for a follow-up from his surgery. She reported that, since his surgery, "his mom tells me that he can breathe easily through his nose. His voice is okay. He has no sore throat. He is sleeping much better with no snoring. He is eating well." (Tr. 423). She observed that he was healing well and discharged him. (Tr. 423). Plaintiff also saw Dr. Rooja Jhaveri, M.D. for evaluation of his respiratory and reflux symptoms. (Tr. 421). Ms. Sath reported that after Plaintiff's surgery, "his nighttime symptoms have vastly improved." (Tr. 419). Plaintiff was in kindergarten and "doing okay in school." (Tr. 420).

On June 3, 2011, Plaintiff was evaluated by Catherine A. Roden, P.A., for a cardiology reevaluation. (Tr. 428-430). Ms. Sath reported that he had not had any seizures for over a year. (Tr. 429). Plaintiff was "actively participating in T-ball." (Tr. 429). Ms. Roden noted that

Plaintiff "should avoid significant isometric exercises such as competitive wrestling, football, and powerlifting. He has no restrictions in aerobic exercise." (Tr. 429).

On June 16, 2011, Plaintiff was evaluated in the Allergy and Immunology Clinic at Hershey Medical Center. (Tr. 432). Notes indicate that "his mother and grandmother…state that [Plaintiff] has actually been doing quite well since the addition of Singulair about a month and half ago…[h]e has no nocturnal cough." (Tr. 432). Plaintiff's reflux symptoms had "improved greatly." (Tr. 433). Ms. Sath reported that "[h]e has no snoring at this time, and he has had no seizures since last year." (Tr. 433).  Plaintiff was evaluated the same day in the neurology department. (Tr. 426).  Ms. Sath reported that Plaintiff "sleeps from about 9pm through to 7 AM. He occasionally awakens briefly and goes back to sleep. He has not had daytime sleepiness." (Tr. 426). During Plaintiff's neurological exam, he was alert and spoke in "full clear sentences. He was very talkative and inquisitive." (Tr. 427). Plaintiff's "motor examination revealed normal muscle tone and bulk with full and symmetrical strength in the arms and legs against gravity and resistance typical for age….Coordination testing revealed intact finger-nose movements without dysmetria or tremor…The gait was steady and narrow-based." (Tr. 427).

Plaintiff received her denial notice on June 20, 2011. On July 20, 2011, she obtained counsel to pursue an appeal. (Tr. 93-94). The next day she submitted a Questionnaire for Children Claiming SSI benefits. (Tr. 93-94, 204). She reported that Plaintiff was not in a special education program, but that "school staff watch [Plaintiff] closely due to [his] heart [condition]." (Tr. 205). She reported that Plaintiff did not receive any special counseling or tutoring. (Tr. 205). For the first time, she reported that Plaintiff had been tested/evaluated by a mental health/mental retardation center and a child welfare/social services agency. (Tr. 206). She reported that

Plaintiff did not receive any special therapy, exercises, or other services for his impairment. (Tr. 207). She reported that Plaintiff plays T-ball. (Tr. 209). She reported that Plaintiff's medications were "working for symptoms [Plaintiff] currently has." (Tr. 209).

On July 25, 2011, Ms. Sath completed a Function Report. (Tr. 197-203). She indicated that Plaintiff had no new "mental limitations as a result of [his] illnesses, injuries, or conditions since [she] last completed a disability report." (Tr. 197, 214). When asked if Plaintiff had "seen or will see a doctor/hospital/clinic or anyone else for emotional or mental problems," she indicated "[n]o." (Tr. 198). She indicated that Plaintiff's only problems with caring for his needs were that his heart condition limited his physical activities and exposure to sun. (Tr. 201, 217). On August 10, 2011, Ms. Sath submitted a worksheet that indicated that Plaintiff's only illnesses and injuries were his heart murmur and seizure activity. (Tr. 303).

On October 13, 2011, Plaintiff was evaluated at the Family Practice Center for a six-year old well-child visit. (Tr. 406). Plaintiff was "[d]escribed as having some behavior problems." (Tr. 407). Plaintiff's motor exam revealed no deficits, as he was able to heel/toe walk, dress/undress, sit and play/watch a movie for greater than twenty minutes, tie his shoes, and walk backwards with heel/toe five steps. (Tr. 407). Plaintiff was reported to get along with his peers, parents, and siblings, help around the house and do chores. (Tr. 407). He was "physically active" and participating in T-ball. (Tr. 407). Ms. Sath reported that he was falling asleep at school and they were "letting him sleep," but also noted that he was "very active at home and school most times." (Tr. 407). Notes indicated that his cardiologists believed he was stable and that he "acts normal at home." (Tr. 407). However, Ms. Sath indicated that he does not stay on task well, sit still or focus for very long. (Tr. 407). Ms. Sath denied all other psychological symptoms. (Tr.

407). Plaintiff's musculoskeletal exam was normal with full range of motion bilaterally in upper and lower extremities and a normal gait. (Tr. 408). Plaintiff was awake and alert and was "[h]yper and running around in room." (Tr. 409). Plaintiff's speech was appropriate for his age and had normal mood, affect, thought content, and perceptions. (Tr. 409).

With regard to Plaintiff's sleep problems, notes indicate "unsure of accuracy of this claim but will do sleep study…for further [evaluation]." (Tr. 410). With regard to Plaintiff's ADHD, notes indicate that Plaintiff "definitely is hyperactive and jumps from one topic to another…He will not be a candidate for stimulant but may consider Intuniv or Strattera if Dr. Middlestead agrees on this." (Tr. 410). There is no record of any follow-up from this record.

On January 20, 2012, Kim Guiser, Plaintiff's first grade teacher for part of the year, completed a teacher assessment. (Tr. 441). She indicated that she had been his teacher for less than three months. (Tr. 435). She reported that Plaintiff was on grade level in all subjects, did not receive any special education services, and did not have an unusual degree of absenteeism. (Tr. 435).

In acquiring and using information, she reported "no problem" with understanding and participating in class discussions.  (Tr. 436). She reported a slight problem in understanding school and content vocabulary and providing organized oral explanations and adequate descriptions. (Tr. 436). She reported an obvious problem understanding oral instructions. (Tr. 436). She reported a serious problem with reading and comprehending written material, learning new material, recalling and applying previously learned material, and  applying problem solving skills in class discussions. (Tr. 436). She reported a very serious problem with comprehending and doing math problems and expressing ideas in written form. (Tr. 436). She explained that

"[Plaintiff] needs frequent one on one direct instruction, redirection, and reinforcement especially in math, writing, (handwriting and written expression), and reading. He needs more time to complete tasks." (Tr. 436).

She opined that Plaintiff had "serious" limitations in only two out of seven activities for moving about and manipulating objects, and less than serious limitations in the remaining five of seven activities. (Tr. 438). She reported no problem with moving the body from one place to another. (Tr. 438). She reported a slight problem with integrating sensory input with motor output, and planning, remembering, and executing controlled motor movements. (Tr. 438). She reported an obvious problem with moving and manipulating things and showing a sense of body's location and movement in space (Tr. 438). She reported a serious problem with managing pace of physical activities or tasks and demonstrating strength, coordination, and dexterity. (Tr. 438). She did not report any activities that had "very serious" problems. (Tr. 438). She explained that Plaintiff's "handwriting is usually not legible," he holds his pencil incorrectly, and he "has difficulty managing and using math manipulatives such as counters, cubes, etc." (Tr. 438).

She opined that Plaintiff had "serious" limitations in only one out of ten activities in caring for self, and less than serious limitations in the remaining nine activities. (Tr. 439). She reported no problem with taking care of personal hygiene or taking needed medications. (Tr. 439).  She noted slight problems with using good judgment regarding personal safety and dangerous circumstances (Tr. 439). She reported obvious problems with being patient, caring for his physical needs, handling frustration appropriately, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and knowing when to ask for help. (Tr. 436). She reported serious problems with using appropriate coping skills to

meet daily demands of the school environment. (Tr. 439). She noted that Plaintiff "had been wearing mostly elastic waist pants because he was unable or unwilling to try and button/snap and zipper," he often calls out in class, and "[w]hen extremely upset, he puts his hands up to his ears, shakes his head, making sounds, and on one occasion he rolled down onto the floor." (Tr. 439). Mrs. Guiser noted that he "has problems focusing on work tasks and maintaining an appropriate and necessary attention span to be successful with our first grade curriculum. He also does not put forth his best effort and quickly gives up on tasks that require concentration, multiple steps and attention to detail." (Tr. 441).

The ALJ held a hearing on February 1, 2012, at which Ms. Sath testified. (Tr. 30-39). Ms. Sath discussed Plaintiff's motor difficulties at length. Ms. Sath testified that Plaintiff was able to undress, but not to dress, and was specifically unable to buckle his pants. (Tr. 44). Ms. Sath testified that Plaintiff was unable to pull on a t-shirt or his underwear. (Tr. 48). She explained that he was unable to buckle his pants because his hands were weak. (Tr. 45). Ms. Sath testified that Plaintiff refuses to learn how to tie his shoes or try to tie them. (Tr. 56). Ms. Sath testified that Plaintiff was unable to feed himself, and that she had to feed him. (Tr. 45). She testified that he could drink from a glass of water, but could not hold a spoon or a fork. (Tr. 46). Ms. Sath testified that Plaintiff does not fully participate in gym class and could not run for more than five minutes without getting short of breath. (Tr. 60, 76). She reported that Plaintiff was not allowed to play basketball, soccer, football, or wrestling, according to his cardiologist. (Tr. 53). However, Ms. Sath testified that Plaintiff played with remote control and Hot Wheel cars. (Tr. 47). Ms. Sath admitted Plaintiff is able to play on a Wii with games like Mario and car racing games. (Tr. 50). Ms. Sath testified that Plaintiff was able to play on the playground, swing on his belly, climb

up the ladder and go down the slide. (Tr. 54). Ms. Sath noted that Plaintiff played T-ball the previous summer, would play again the following spring, and was sometimes even able to hit the ball without the tee when the coaches pitched it to him. (Tr. 52). Ms. Sath testified that Plaintiff's sleep symptoms did not improve after his surgery and that Plaintiff's medication had not improved his reflux symptoms. (Tr. 40, 60).

Ms. Sath testified that Plaintiff does not follow directions because he does not want to obey or listen. (Tr. 57). Ms. Sath testified that Plaintiff's ability to do his chores what "very poor" and "has to be told a million times it feels." (Tr. 54). Ms. Sath testified that Plaintiff does not do puzzles because they frustrate him. (Tr. 48). Ms. Sath testified that Plaintiff's reading was "very, very poor" and that his subtraction was "terrible." (Tr. 43). Ms. Sath testified that when Plaintiff comes home from school, he is unable to tell her what they learned that day. (Tr. 76). Ms. Sath testified that Plaintiff had mood swings and crying tantrums at least two to three times a week at school. (Tr. 61). Ms. Sath testified that Plaintiff will throw himself into a wall or bang his head against the wall when he is having a tantrum.  (Tr. 69). She testified that Plaintiff will also bang his fists into his head almost every day. (Tr. 69). However, Ms. Sath testified that Plaintiff was not yet receiving support in school. (Tr. 43). Ms. Sath testified that Plaintiff was able to sit through an entire movie, but only in movie theaters when he knows he cannot get up. (Tr. 63). She testified that they go to the movies on average every other month. (Tr. 64).

Ms. Sath testified that Plaintiff continued having seizures, although they had slowed, and that he had two seizures in the last six months, in October and November of 2011. (Tr. 57).  She testified that she took him to the emergency room both times. (Tr. 58). At the end of the hearing, the ALJ mentioned that he did not have the records from Plaintiff's alleged October and

November visits to the emergency room. (Tr. 76).  Ms. Sath testified that she was "not sure how [she could] go about getting them," but that they had been seen at the Hershey Medical Center. (Tr. 77). Counsel for Plaintiff reported that he would request those records. (Tr. 77). The ALJ left the record open for two weeks for Counsel to submit the school records, including the IEP, and the emergency department records. (Tr. 79). No emergency records documenting Plaintiff's supposed seizures in October and November of 2011 were ever submitted to the ALJ, the Appeals Council, or the Court.

On February 16, 2012, Plaintiff was evaluated, at the request of his mother, for eligibility for special education services. (Tr. 475). A team of evaluators, including a school psychologist, completed an IEP. (Tr. 488). The report indicated that "[Plaintiff's] teachers recommend that he continue in the regular education curriculum and begin to receive special education services as a student with an Other Health Impairment for Attention Deficit/Hyperactivity Disorder. [Plaintiff] is in need of a highly structured school day with multiple supports and accommodations in order to be successful." (Tr. 477).

Mrs. Inch, a member of the IEP team, noted that Plaintiff "is a friendly student who gets along well with his peers. He usually has a positive attitude and cooperates in the Title I setting. [Plaintiff] does well with segmenting words. He knows most of the letter sounds and can apply this knowledge to decode words. However, he often gets distracted in the middle of a word and forgets what he is doing. [Plaintiff] also struggle with comprehension and remembering details because his mind wanders to other subjects when reading a passage. Getting [Plaintiff] to focus on the task at hand is the biggest challenge during instruction. He is very willing to participate in class, but he's often not talking about the same topic we are working on. When writing, he needs

constant one-on-one attention or he will just do it quickly and carelessly." (Tr. 477).

After a range of intellectual tests, the IEP concluded that Plaintiff's "overall intellectual ability, as measured by the WJ III GIA (Std), is in the average range of standard scores." (Tr. 481). The IEP specified that Plaintiff's "verbal ability (acquired knowledge and language comprehension)," his "thinking ability (intentional cognitive processing)," his "cognitive efficiency (automatic cognitive processing)," his phonemic awareness and working memory, his academic skills, and his standard score in reading were all in the "average range when compared to others at his age level." (Tr. 482). However, the IEP noted that Plaintiff's achievement in brief mathematics was significantly lower than predicted by his cognitive scores. (Tr. 482). The IEP noted that Plaintiff "functions within the appropriate levels of independent functional performance. There are no concerns at this time." (Tr. 486).

The IEP also evaluated Plaintiff's social, emotional, and adaptive behavior. (Tr. 486-88). Plaintiff had "significantly deviant" scores on the Scale for Assessing Emotional Disturbance. "Results from the SAED indicate that [Plaintiff] is experiencing significant emotional and behavioral problems in the school environment that are negatively impacting his academic performance and progress in the general education curriculum." (Tr. 488). The IEP also indicated that "[d]ue to [Plaintiff's] poor fine motor skills and a screening by the occupational therapist indicates a need for occupational therapy evaluation." (Tr. 489).

On March 5, 2012, the ALJ issued a decision finding Plaintiff to be not disabled. (Tr. 12-29). The ALJ found that Plaintiff was born on September 1, 2005, and was a preschooler on the

date the application was filed. (Tr. 15, Finding 1).[4] Plaintiff was a school-age child on the date of the decision. 20 C.F.R. § 416.926a(g). At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity after the application date. (Tr. 15, Finding 2). At step two, the ALJ found that Plaintiff's asthma, seizure disorder, and attention deficit hyperactivity disorder were medically determinable and severe, but found that Plaintiff's aortic valve abnormality and gastrointestinal reflux disorder were nonsevere. (Tr. 15, Finding 3). At step three, the ALJ found that Plaintiff did not meet or medically equal the severity of any of the Listed impairments. (Tr. 16, Finding 4). At step three, the ALJ also found that Plaintiff's impairments did not functionally equal the severity of any Listed impairment. (Tr. 17-26, Finding 5).

In the three disputed domains, the ALJ found that Plaintiff had less than marked impairments. For acquiring and using information, he acknowledged that Plaintiff's education records, including Mrs. Guiser's report, indicated a decline since kindergarten, and that his ADHD, low frustration tolerance, and asthma would affect his ability to keep up with his peers. (Tr. 20). However, the ALJ noted that Plaintiff had no auditory or visual impediments to acquiring and using information, his kindergarten teacher noted few obvious problems in this domain, he tested in the "average" range during his IEP evaluation, he was good at segmenting words, and the IEP did not recommend a special education curriculum. (Tr. 20). The ALJ rejected Mrs. Guiser's opinion in this domain, explaining that "Ms. Guiser did not speak consistently with regard to the child's limitations during the formulation of his IEP. Of particular note, she did not explain a discrepancy between the child's allegedly "serious problem" in

---

[4] The ALJ also found that Plaintiff was a preschooler on March 5, 2012, when the decision was issued. (Tr. 15). However, this finding was incorrect-Plaintiff was six and a half years old on the date of the decision, which means the regulations would classify him as a school-age child. 20 C.F.R. § 416.926a(g).

applying previously learned material and the ability to participate in class discussions and to provide organized oral explanations." (Tr. 20).

In the domain of moving and manipulating objects, the ALJ acknowledged that Mrs. Guiser and Ms. Sath identified motor deficits, and that the IEP recommended an occupational therapy evaluation. (Tr. 23). However, the ALJ noted that Plaintiff was able to participate in organized sports, could play with his toys and Wii, climb ladders at the playground, and run and jump around. (Tr. 23). The ALJ also rejected Ms. Sath's testimony in this domain, noting that the medical evidence contradicted Ms. Sath's claims of disabling fatigue and sleep issues and that her testimony was internally inconsistent with regard to Plaintiff's ability to hold a glass, fork, or scissors. (Tr. 23).

In the domain of caring for himself, the ALJ acknowledged that Plaintiff's tendency to throw tantrums or shut down when frustrated caused a limitation in this domain. (Tr. 24). However, he concluded that it was not a marked limitation because he had no problem with personal hygiene, pursued pleasurable activities, had no problem with appetite, taking medication, or adhering to bedtime, and did not exhibit dangerous antisocial behavior or regressive behavior.  (Tr. 24). He explained that "it is telling that Ms. Sath did not report issues with her son's 'ability to take care of personal needs' in the initial disability paperwork, contrary to her allegations at the hearing." (Tr. 24). The ALJ also rejected Ms. Sath's description of self-injurious behavior because it was contradicted by the record. (Tr. 24).

## VI.     Plaintiff Allegations of Error

### A.      The ALJ's evaluation of Mrs. Guiser's report

Plaintiff asserts that the ALJ failed to explain why he gave limited weight to Ms. Guiser's opinion. Plaintiff asserts that Social Security Ruling 06-03p requires the Administrative Law Judge to assess the weight to be given a teacher questionnaire the same way that a treating physician's opinion is assessed. (Pl. Brief at 11). Plaintiff further asserts that the only evidence that was inconsistent with Ms. Guiser's report was the state agency physician opinion. (Pl. Brief at 12).

Defendant responds that the ALJ addressed Mrs. Guiser's report in his discussion of the six domains of functioning, and that his explanation was sufficient for judicial review. (Def. Brief at 24). The Court agrees, and finds that the ALJ made specific findings supported by sufficient explanation with regard to Ms. Sath and Mrs. Guiser in the text of his discussion of the six domains of functioning. ALJs need not use "particular language or adhere to a particular format" in reaching a decision, Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), and a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 305 (3d Cir. 2013). Here, the ALJ's decision is clear and easily discerned. Thus, the ALJ sufficiently discharged his duty to provide sufficient explanation for his decision.

The Third Circuit has held that an ALJ must "fully develop the record and explain his findings at step three, including an analysis of whether and why [the claimant's] ... impairments ... are or are not equivalent in severity to one of the listed impairments." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119–20. However, the Third Circuit subsequently noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient

development of the record and explanation of findings to permit meaningful review." <u>Jones v.</u>

<u>Barnhart</u>, 364 F.3d 501, 505 (3d Cir. 2004). In <u>Jones</u>, the Court held that, where the ALJ

"considered the appropriate factors" and "discusse[d] the evidence pertaining to" the relevant

listings, the explanation was sufficient to allow for judicial review. <u>Id</u>.

The regulations for evaluating medical source opinions generally apply to teacher's

opinions:

> Opinions from "non-medical sources" who have seen the individual in their professional
> capacity should be evaluated by using the applicable factors listed above in the section
> "Factors for Weighing Opinion Evidence." Not every factor for weighing opinion
> evidence will apply in every case….
>
> Although there is a distinction between what an adjudicator must consider and what the
> adjudicator must explain in the disability determination or decision, the adjudicator
> generally should explain the weight given to opinions from these "other sources," or
> otherwise ensure that the discussion of the evidence in the determination or decision
> allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when
> such opinions may have an effect on the outcome of the case.

SSR 06-03p. Thus, the ALJ need not specify the weight given to a teacher's opinion when the

ALJ otherwise ensures that a subsequent reviewer can follow the adjudicator's reasoning. Id.

Here, the ALJ explained that Mrs. Guiser's report, along with the IEP, "support the belief

that the child's impairments do not cause a 'marked' limitation in any of the functional

domains." (Tr. 18). In his evaluation of Plaintiff's ability to acquire and use information, ALJ

found Mrs. Guiser's opinion to be internally inconsistent and inconsistent with the record as a

whole. He credited Mrs. Guiser's opinion that Plaintiff would need frequent one on one direct

instruction, redirection, and reinforcement and needed more time to complete tasks, but found

that this did not rise to the level of a marked impairment. The ALJ also wrote that "Ms. Guiser

did not speak consistently with respect to the child's limitations." (Tr. 20). The ALJ noted that,

in this domain, Ms. Guiser opined that Plaintiff had "no problem" participating in class discussions and providing organized oral explanations, but a "serious problem" in applying previously learned material. (Tr. 20). The ALJ also cited to specific evidence that contradicted her assessment in this domain, noted that Mrs. Inch noted Plaintiff did well with segmenting words, he scored in the "average" range of intellectual functioning on his IEP, and the IEP team did not recommend the use of a special education curriculum. Thus, the ALJ identified internal inconsistencies and contradictory school records to discount Mrs. Guiser's opinion.

In the other two disputed domains, the ALJ acknowledged and credited Mrs. Guiser's report, but still concluded that it did not support a finding that Plaintiff had a marked or extreme limitation. In the moving and manipulating objects domain, the ALJ noted Mrs. Guiser's report and Ms. Sath's testimony and found them to be consistent with each other. (Tr. 23). However, the ALJ emphasized that other evidence, including Plaintiff's ability to play T-ball, play with toys, use a Wii, climb ladders on the playground, and run or jump around "like a nut" demonstrated that Plaintiff did not have a marked limitation in that domain. (Id.).

In the caring for self domain, Mrs. Guiser opined that Plaintiff had "serious" limitations in only one out of ten activities in caring for self, and less than serious limitations in the remaining nine activities. (Tr. 439). The ALJ noted that Mrs. Guiser opined that Plaintiff responds well to normal behavior modification techniques and she did not indicate the persistence or intensity of self-injurious behavior reported by Ms. Sath. (Tr. 24). He acknowledged Mrs. Guiser's report that Plaintiff may throw a tantrum or shut down when frustrated, but also noted her opinion that Plaintiff had no problem caring for personal hygiene. (Tr. 24, 439). The ALJ proceeded to cite to additional evidence, including the IEP and Ms.

Sath's testimony, which supported his determination that Plaintiff's limitation in this domain was less than marked. (Tr. 24).

The Court finds that the ALJ acknowledged and evaluated Mrs. Guiser's opinion in a manner that allows the Court to "follow the adjudicator's reasoning." SSR 06-03p. Thus, there is no merit to this allegation of error.

### B.       The ALJ's credibility assessment

Plaintiff asserts that the ALJ failed to state whether he credited Ms. Sath's testimony, and that absent such an explanation, meaningful review is impossible. (Pl. Brief at 17). Defendant responds that the ALJ considers Plaintiff's subjective symptoms in each functional domain, and in doing so, made credibility findings. (Def. Brief at 24).

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; See also 20 C.F.R. § 416.929 ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence."). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P

Here, the structure of the ALJ's decision demonstrates that he acknowledged Ms. Sath's testimony, but found it to be not fully credible. In his functional equivalence analysis, the ALJ explains that, in order to evaluate functional equivalence, he had to consider Plaintiff's symptoms and the extent to which his alleged symptoms were consistent with the objective medical evidence and other evidence. (Tr. 17). The ALJ then explained he had to make a finding as to the credibility of Ms. Sath's statements in order to determine whether Plaintiff functionally equaled a listing. (Tr. 17). The ALJ then summarized Ms. Sath's testimony. (Tr. 18). However, the ALJ then explained that he did not find that Plaintiff functionally equaled a Listing because he gave great weight to the state agency medical consultants, who opined that Plaintiff had less than marked limitations in each domain, because the IEP showed that Plaintiff had less than marked limitations in each domain, and Plaintiff responded positively to medication. (Tr. 18). Thus, it is clear from the ALJ's decision that he rejected Ms. Sath's testimony to the extent it was inconsistent with the state agency consultants, IEP and treatment records. (Tr. 18).

The ALJ proceeded to identify specific testimony by Ms. Sath that was inconsistent with objective medical evidence and other evidence. For instance, the ALJ wrote the "[t]he records do not corroborate Ms. Sath's testimony with regard to the frequency of her son's grand mal seizures. The evidence does not support Ms. Sath's claims that the acid reflux medication does not help at all or that the use of Tegretol did not improve his seizure disorder until recently." (Tr. 26, n. 5) (citing Tr. 30-79, 191 [6E:11], 370 [4F:43], 385 [4F:58], 387 [4F:60], 407 [6F:13], 226 [6F:32], 464 [9F:10], 465 [9F:11])

Ms. Sath had testified at the hearing on February 1, 2012 that Plaintiff continued having seizures, that the Tegretol had just started working, and that she had visited the emergency room

twice a result of seizures in the past six months. (Tr. 57-58, 76-79). Her counsel stated that he would provide records from the emergency room visits she testified Plaintiff had after each seizure. (Tr. 57-58, 76-79). No records were ever provided. The records cited by the ALJ show that, on April 26, 2010, Ms. Sath reported that his seizure activity "improved significantly" as soon as they started using Tegretol. (Tr. 370). After another seizure on May 2, 2010, Plaintiff's Tegretol was increased. (Tr. 385). After the Tegretol was increased, the records cited by the ALJ show that, on July 12, 2010, Ms. Sath reported that Plaintiff had had no seizures since starting his current dose of Tegretol (Tr. 387), and on June 16, 2011, Ms. Sath reported that Plaintiff "has gone for a year without any seizures." (Tr. 226, 464).   They also show that, on July 16, 2011, Ms. Sath reported that, after the addition of Singulair, Plaintiff was "doing quite well." (Tr. 465). In the same visit, Ms. Sath reported that Plaintiff's reflux symptoms had greatly improved. (Tr. 466). She again reported that he had had no seizures "since last year." (Tr. 466). The records cited by the ALJ show that, on October 13, 2011, Ms. Sath reported that Plaintiff had "[n]o seizure[s] since last year." (Tr. 407). Ms. Sath also reported that Plaintiff "is very active at home and school most times…He acts normal at home…His asthma is well controlled on Flovent and Singulair. His GERD stable on Zantac." (Tr. 407). Ms. Sath testified that Plaintiff experienced a possible seizure at school, (Tr. 57), but the records cited by the ALJ show that, according to Ms. Lutinski, "[h]is mother has reported seizure and heart issues but we have not seen them here at school." (Tr. 191). These records all indicate inconsistencies that undermine credibility.

       More importantly, the ALJ discredited Ms. Sath's testimony in two of the three disputed domains: moving about and manipulating objects and caring for himself. The ALJ noted that Ms. Sath's testimony regarding Plaintiff's ability to move around and manipulate objects was largely

consistent with Ms. Guiser's report, but noted that "Ms. Sath does not speak consistently with respect to the child's ability to hold a glass, or to use a pencil and scissors." (Tr. 23) (citing Tr.30-79, 162 [2E:8]). At the hearing, Ms. Sath had testified that Plaintiff's ability to use scissors was "terrible. He can't do it by himself." (Tr. 56). However, the ALJ cites to a report completed by Ms. Sath on December 28, 2010, when she reported that Plaintiff "uses scissors fairly well." (Tr. 162). The ALJ also writes that "the medical and nonmedical evidence does not corroborate Ms. Sath's testimony with regard to the child's recent sleep issues. According to her hearing testimony, the child continues to play with his toys, to use his Wii, to climb ladders at the playground, and to run or jump around "like a nut" all the time."  (Tr. 23).

The Court also notes that Ms. Sath's testimony was inconsistent the medical evidence with regard to Plaintiff's motor issues. None of Plaintiff's treating providers indicated problems with Plaintiff's motor skills.  At Plaintiff's December 28, 2009 evaluation at Enhanced Mental Health Services, notes indicate that he "enjoys playing blocks, playing at the park, listening to stories that are read to him and watching TV" and "demonstrates adequate gross motor skills. His gait appears normal." (Tr. 442). At Plaintiff's April 20, 2010 evaluation with Dr. Trescher, his "[m]otor examination revealed normal muscle tone, bulk and full strength in the arms and legs. Finger-nose movements were intact without ataxia or tremor. Hand tapping and pronation and supination were symmetrical…His gait was steady and narrow base." (Tr. 382). At a follow-up with Dr. Trescher on July 12, 2010, Plaintiff's motor examination was normal, with normal muscle tone, bulk, and full strength. (Tr. 312). "He was able to reach for objects without any ataxia or tremor." (Tr. 312). Plaintiff's gait was steady, and he was "able to bounce the ball around the room without any difficulty." (Tr. 312). At Plaintiff's August 23, 2010 evaluation at

Swisher Behavior Health Services, "[n]o gross motor deficits were noted and gait was observed to be normal." (Tr. 296).

At Plaintiff's five year well-child visit at the Family Practice Center on September 13, 2010, he met his developmental markers, as he was able to print his name, use "I" correctly, sit and play or watch a movie for more than twenty minutes, draw a person with at least five body parts, skip, jump on one foot, and dress himself without help. (Tr. 341). Plaintiff walked normally with full range of motion in his upper and lower extremities bilaterally. (Tr. 343). Although Ms. Sath testified that Plaintiff was restricted from running, his cardiologist noted on in April of 2010 and June 3, 2011 only that he "has no restrictions in aerobic exercise." (Tr. 429) At Plaintiff's June 16, 2011 allergy evaluation, "[t]he motor examination revealed normal muscle tone and bulk with full and symmetrical strength in the arms and legs against gravity and resistance typical for age….Coordination testing revealed intact finger-nose movements without dysmetria or tremor…The gait was steady and narrow-based." (Tr. 427). At Plaintiff's six-year old well-child visit on October 13, 2011, Plaintiff's motor exam revealed no deficits, as he was able to heel/toe walk, dress/undress, sit and play/watch a movie for greater than twenty minutes, tie his shoes, and walk backwards with heel/toe five steps. (Tr. 407). Plaintiff was "physically active" and participating in T-ball. (Tr. 407). His musculoskeletal exam was normal with full range of motion bilaterally in upper and lower extremities and a normal gait. (Tr. 408).

The ALJ similarly rejected Ms. Sath's credibility with regard to Plaintiff's ability to care for himself. The ALJ wrote that "it is telling that Ms. Sath did not report issues with her son's ability to take care of personal needs in the initial disability paperwork, contrary to her hearing testimony." (Tr. 24). As discussed above, in Ms. Sath's December 28, 2010 report, she indicated

that Plaintiff's impairments did not "limit [his] progress in understanding and using what he or she has learned" and did not "affect [his] habits and ability to take care of personal needs." (Tr. 163). The ALJ also wrote that the record did not support Ms. Sath's testimony regarding self-injurious behavior. (Tr. 24). Ms. Sath reported on December 28, 2009 that "[t]antrum behaviors identified as hitting his head with his fists, stomping feet, throwing objects and screaming have decreased to zero in the home, school, and community setting." (Tr. 444).

Consistency is a strong indicator of credibility, SSR 96-7p, and these inconsistencies provide substantial evidence to the ALJ's credibility determination. The ALJ's credibility finding is entitled to deference and should not be discarded lightly, given her opportunity to observe the individual's demeanor, Murphy v. Schweiker, 524 F. Supp. 228, 232 (E.D. Pa. 1981), and an ALJ's credibility determination need only be supported by substantial evidence on the record as a whole. Miller v. Commissioner of Soc. Sec., 172 F.3d 303, 304 n.1 (3d Cir. 1999). Plaintiff does not challenge the ALJ's analysis except to argue that the ALJ made no finding whatsoever as to Ms. Sath's credibility. Because the Court finds that the ALJ made specific credibility findings within the context of his broader analysis, and Plaintiff does not otherwise challenge the ALJ's credibility analysis, the Court finds no merit to this allegation of error by the Plaintiff.

### C.     The ALJ's assignment of great weight to a state agency physician

Plaintiff asserts that the ALJ erred in assigning weight to the state agency physician and failed to obtain an updated opinion pursuant to SSR 96-6p. An ALJ may rely on the opinions of non-examining physicians if the opinions are consistent with the record. Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). The regulations explain that "[s]tate agency medical and psychological consultants and other program physicians, psychologists, and other medical

specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). Consequently, they are evaluated in the same way other medical source opinions are evaluated. 20 C.F.R. § 404.1527(e)(2)(ii). However, an ALJ may not rely on a state agency opinion on the issue of meeting or medically equaling a listing without obtaining an updated opinion "when additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p.

SSR 96-6p did not require the ALJ to obtain an updated medical opinion in this case. First, SSR 96-6p addresses medical equivalence, not functional equivalence. Plaintiff has not challenged the ALJ's medical equivalence finding.  Moreover, evidence identified by Plaintiff would not change the state agency psychologist's equivalence finding. Plaintiff identifies the allergist report from June 16, 2011, but this report indicated that Plaintiff's asthma and reflux had improved "significantly" on medication, were well-controlled, and his mother stated he had no seizures over the last year. (Tr. 260). Plaintiff identifies the cardiologist report from June 3, 2011, but this report indicates that Plaintiff was relatively healthy, had no seizures for over a year, had no restrictions in aerobic exercise, and was clinically stable. (Tr. 262). Plaintiff identifies his successful tonsillectomy on March 25, 2011, but follow-ups indicate the surgery was successful and resolved Plaintiff's sleep issues. (Tr. 272). Plaintiff cites to the six-year old well-child visit, but this visit indicated Ms. Sath reported Plaintiff could tie his shoes, gets along with his peers and helps out around the house, and, although he does not stay on task well, acts

"normal" at home and is very active at home and school. Mrs. Guiser's report and the IEP were new, but neither is medical evidence and neither supports a finding of marked limitation. Thus, SSR 96-6p did not require an updated opinion.

### VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: August 19, 2014                                          s/Gerald B. Cohn
                                                                                      GERALD B. COHN
                                                                            UNITED STATES MAGISTRATE JUDGE